IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CARMINE JOSHUWA GARGANO, | ) | CASE NO. 1:18-cv-00325 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Carmine Joshuwa Gargano ("Plaintiff" or "Gargano") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for social security disability benefits. Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 10. For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

Gargano protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on July 23, 2013.[1] Tr. 85-86, 177-180, 181-186, 389. Gargano alleged a disability onset date of May 15, 2013. Tr. 177, 181, 202, 226. He alleged disability due to memory problems, bipolar disorder, cannabis dependence, schizoaffective disorder, and back problems. Tr. 64, 87, 117, 133, 202. Gargano's applications were denied

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 2/27/2019).

initially (Tr. 117-130) and upon reconsideration by the state agency (Tr. 133-137). Thereafter, he requested an administrative hearing. Tr. 143-144. On April 28, 2015, Administrative Law Judge Eric Westley ("ALJ" or "ALJ Westley") conducted a hearing. Tr. 36-63.

On May 19, 2015, the ALJ denied benefits, determining that Gargano had not been under a disability within the meaning of the Social Security Act from May 15, 2013, through the date of the decision. Tr. 19-35. Gargano requested review of the ALJ's decision by the Appeals Council. Tr. 14-18. On February 11, 2016, the Appeals Council denied Gargano's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-6.

Gargano filed an appeal in the U.S. District Court for the Northern District, Case No. 1:16-cv-00796, and, on March 13, 2017, this Court reversed and remanded the Commissioner's decision, finding that the ALJ's analysis of the medical opinion evidence was insufficient to allow the Court to assess whether the decision was supported by substantial evidence. Tr. 452-489. Pursuant to the Court's remand order, on May 30, 2017, the Appeals Council remanded the case to an Administrative Law Judge for further proceedings consistent with the Court's order. Tr. 491-495.

Following issuance of the remand order, ALJ Westley conducted a hearing in November 2017.[2] Tr. 406-435. On December 7, 2017, the ALJ denied benefits, finding that Gargano had not been under a disability within the meaning of the Social Security Act from May 15, 2013, through the date of the decision. Tr. 386-405. There is no indication that Gargano filed written exceptions to the ALJ's December 7, 2017, decision or that that the Appeals Council reviewed

---

[2] The hearing transcript contains two different hearing dates - November 7, 2017, and November 11, 2017. Tr. 406, 408, 435.

the decision on its own.[3]  Doc. 12, p. 3.  Thus, the ALJ's December 7, 2017, decision became the final decision on the 61st day following the ALJ's notice of decision.  Tr. 387.  On February 9, 2018, Gargano appealed the ALJ's December 7, 2017, decision to this Court.  Doc. 1.

## II. Evidence

### A.   Personal, vocational and educational evidence

Gargano was born in 1983.  Tr. 42, 177.  Gargano completed school through the 12th grade and started working right after high school.  Tr. 42-43.  He worked at a coffee/donut shop owned by his father.  Tr. 45-46.  The shop sold other items such as tobacco and lottery.  Tr. 45. Gargano stocked shelves and performed janitorial work.  Tr. 45-46.  Gargano had some minimal supervisory responsibilities.  Tr. 45-46.  For example, if someone did not show up for work, he would call them or try to find out why they were not at work.  Tr. 46.  Ultimately, his father fired him because he had made some female co-workers cry and was showing up late or not showing up for work.  Tr. 46-47.   Gargano was not told and he does not know what he did to make his co-workers cry.  Tr. 47.  Gargano worked for a painting company doing outdoor painting when he was in high school.  Tr. 47-48.  Gargano worked in the fall of 2014 at a zombie paintball attraction at Mapleside, an apple farm.  Tr. 43-45, 419-420.  His friends were responsible for running the paintball attraction so his schedule was pretty much whatever he wanted it to be.  Tr. 44.  Gargano was not fired from the job; the job just ended.[4]  Tr. 45.

---

[3] 20 C.F.R. § 404.984 provides that, "when a case is remanded by a Federal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand on your case unless the Appeals Council assumes jurisdiction of the case."  20 C.F.R. § 404.984(a).  Thus, when a claimant does not file exceptions and the Appeals Council does not assume jurisdiction without exceptions being filed, "the decision of the administrative law judge becomes the final decision of the Commissioner after remand."  20 C.F.R. § 404.984(d).

[4] In addition to the work history discussed herein, the medical records reflect that Gargano may have worked in other capacities after 2014.  *See* Tr. 1017 (9/12/2016 visit – Gargano reported that he lost his job due to another coworker losing something on the job and he was looking for work); Tr. 1013 (12/19/2016 visit – Gargano reported that he was working – moving furniture off and on jobs).

**B.  Medical evidence**

**1.  Treatment history**

On May 15, 2013, Gargano presented to the emergency room at Lutheran Hospital with complaints of hallucinations.  Doc. Tr. 268-271.  Gargano's mother was present with him.  Tr. 238.  Gargano's mother relayed that, over the prior two weeks, her son had been wandering around and acting strange.  Tr. 268.  Gargano considered jumping off a bridge, thinking it was a quarry.  Tr. 268.  Gargano admitted to abusing marijuana and opiates but denied using for about a week.  Tr. 268.  However, the lab results on admission were positive for marijuana.  Tr. 249.  Gargano had never been diagnosed with a mental health issue.  Tr. 268.  He denied any exacerbating or alleviating factors and denied any suicidal or homicidal ideations.  Tr. 268.  On physical examination, Gargano was observed to have a normal mood and affect; his thought content was normal; his speech was rapid and/or pressured and tangential; he was actively hallucinating; his thought content was not paranoid and not delusional; his cognition and memory were normal; he expressed impulsivity; and he expressed no homicidal or suicidal plans or ideation.  Tr. 269.  Gargano was initially diagnosed with hallucinations and schizophrenia.  Tr. 270.  He was admitted to North Coast Behavioral Center from May 17, 2013, through May 31, 2013.  Tr. 248, 272.  His GAF score on admission was 39.[5]  Tr. 252.  Gargano's diagnoses on

---

[5] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *Id.*  With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

admission were bipolar I, hypomanic with psychotic features and marijuana dependence.  Tr. 248.

During his admission at North Coast Behavioral Center, Gargano reported that he did not trust anyone except his mother; he had neglected his personal hygiene, he had periods of over activity and periods of sleeping just a few hours; he lost almost 50 pounds over several months; his spending behavior was reckless; he felt that people were out to get him; and he had very impulsive behavior.  Tr. 248.  Gargano had a history of skeletal pain that led to OxyContin abuse and he almost ended up in trouble for drug trafficking.  Tr. 248.  Gargano also had a past history of using steroids for bodybuilding.  Tr. 248.  When he used steroids, he had racing thoughts.  Tr. 248.  At discharge, Gargano's diagnoses were bipolar I, hypomanic with psychotic features and marijuana dependence (Tr. 252) and his GAF score was 56.[6]  Tr. 252.  At discharge, Gargano was in control; not psychotic; not suicidal; had no auditory or visual hallucinations; his mood was even; and his judgment and insight had improved.  Tr. 251.  Dr. Manual Gordillo, M.D., the discharging physician, recommended that Gargano return home, look for a job, and proceed with outpatient psychiatric follow up at Center for Families and Children Service.  Tr. 252.  Gargano's prognosis was guarded.  Tr. 252.

On July 18, 2013, Gargano began receiving outpatient services at Center for Families and Children Service.  Tr. 301-306.  Gargano saw Maureen Sweeney, NP, for a Psychiatric Evaluation.  Tr. 301-306.  Gargano reported that he was seeking treatment because he was not feeling mentally stable.  Tr. 301.  Gargano's mother was present for the evaluation.  Tr. 301.  Gargano and his mother indicated that his symptoms started when he was 16 or 17 years old.  Tr. 301.  Gargano reported psychomotor agitation (shaking legs) and sleep disturbance.  Tr. 301.

---

[6] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR, at 34.

Gargano was sleeping 2 hours a night. Tr. 301. He reported daily audio hallucinations, visual hallucinations, manic periods lasting for weeks to months, and depressive periods that last for days. Tr. 301. Nurse Sweeney observed that Gargano appeared hypomanic during the evaluation. Tr. 301. Gargano reported using marijuana a couple times per week and drinking alcohol only occasionally. Tr. 301. Gargano felt that the marijuana helped with the pain in his body. Tr. 301. Gargano indicated that he had been working with his father but his father did not want him to work at the donut/coffee shop because of his mental illness. Tr. 302. Gargano indicated that he had a lot of debt from being in business with his father. Tr. 302. Nurse Sweeney diagnosed bipolar I disorder, with psychotic features but rule out schizoaffective disorder, noting that it was unclear whether Gargano's psychotic features go away when Gargano is not manic. Tr. 303. Nurse Sweeney assigned a GAF score of 40. Tr. 304. Gargano was taking Gedeon and Depakote ER but reported having more days of severe depression. Tr. 303. Nurse Sweeney modified Gargano's medications. Tr. 303. She added Seroquel XR, continued Depakote, and decreased the Gedeon dosage. Tr. 303.

Gargano saw Nurse Sweeney again on August 1, 2013. Tr. 308-309. Gargano indicated that he was depressed and irritable. Tr. 308. He was feeling isolated because his father and sister were judgmental about him seeking mental health treatment. Tr. 308. Gargano was continuing to have audio hallucinations but only at night. Tr. 308. Nurse Sweeney observed that Gargano appeared euthymic during the appointment and discussed with Gargano that his feelings of depression could be the effect of returning to euthymia following a period of hypomania. Tr. 308. Gargano reported medication side effects of sedation and muscle tightness. Tr. 309. Nurse Sweeney continued Gargano on Depakote, discontinued Gedeon, increased Seroquel, and added Cogentin to address Gargano's muscle tightness. Tr. 309. On August 13, 2013, Gargano saw

Nurse Sweeney and reported "still feeling really depressed." Tr. 310. Gargano was sleeping about 10 hours each day and still feeling fatigued during the day. Tr. 310. Gargano was continuing to have audio hallucinations but only at night. Tr. 310. Nurse Sweeney ordered Wellbutrin XL to address Gargano's depression but advised that there was a risk that the new medication could cause mania. Tr. 311. Gargano expressed his understanding of the risks and felt that the possible benefits outweighed the risks. Tr. 311. Nurse Sweeney indicated she would see Gargano again in 2 weeks to start him on Wellbutrin XL. Tr. 311. On August 27, 2013, Gargano saw Nurse Sweeney and reported the he was "still feeling pretty down." Tr. 312. Nurse Sweeney started Gargano on Wellbutrin XL. Tr. 313.

On September 23, 2013, Gargano saw Nurse Sweeney. Tr. 315-316. Gargano indicated that his mood was "normal." Tr. 315. During that month, Gargano had a decreased need for sleep and he was having paranoid delusions. Tr. 315. He felt "like there was a conspiracy to get [him]" and "thought that the government was watching [him] and that other people's animals were watching [him.]" Tr. 315. Since starting on Wellbutrin XL, Gargano indicated that he felt less depressed and did not think that the Wellbutrin XL was causing his manic symptoms. Tr. 315. He relayed that, prior to having the manic symptoms, he had an increase in stressors – he had received a number of shut off notices from the city. Tr. 315. Gargano reported that he was continuing to have audio hallucinations. Tr. 315. He explained that, "[he] zone[s] out and [doesn't] hear the t.v. and . . . hear[s] old friend's that are no longer with [him], in a good way[.]" Tr. 315. Nurse Sweeney noted that Gargano was not manic or hypomanic. Tr. 315. Also, she indicated that Gargano's mood had "gotten better" since starting on Wellbutrin XL. Tr. 316. Since Gargano was having psychotic symptoms in the absence of mood deregulation, Nurse

Sweeney suspected that a more accurate diagnosis might be schizoaffective disorder. Tr. 315-316. Nurse Sweeney increased Gargano's Seroquel to target his psychotic symptoms. Tr. 316.

On October 7, 2013, Gargano saw his primary care physician Dr. Mudita Bhatia, M.D., for a physical at which time it was noted that Gargano was receiving outpatient treatment for bipolar disorder. Tr. 294. Gargano indicated that his hallucinations/delusions had improved since May 2013 but, at times, his mother observed him talking to himself or unseen people. Tr. 294. Also, it was noted that Gargano had very low attention and concentration and did not do anything at home except read. Tr. 294.

During an October 21, 2013, appointment with Nurse Sweeney, Gargano indicated that his mood was "okay." Tr. 318. He was continuing to have a difficult time processing stressors but was gaining insight. Tr. 318. He denied psychotic features. Tr. 318. Nurse Sweeney indicated that Gargano appeared stable on his medications. Tr. 319. On November 18, 2013, Gargano saw Nurse Sweeney. Tr. 320. He indicated that "things [were] okay, a little out of sorts[.]" Tr. 320. He indicated that he was "not feeling up or down." Tr. 320. He was mostly medication compliant. Tr. 320. Gargano had no major issues to report. Tr. 320. He reported that his sleep was good. Tr. 320. Gargano was somewhat withdrawn but did not seem uncomfortable with that. Tr. 320. Gargano denied psychotic symptoms and, when asked if he thought his medications were helpful, he indicated, "yes . . . I was really out in left field before the meds[.]" Tr. 320. Gargano's mood was stable. Tr. 320-321. He felt somewhat blunted on his medication but felt that the benefits outweighed the risks. Tr. 321.

On January 2, 2014, Gargano saw Nurse Sweeney reporting, "I am not feeling too good today[.]" Tr. 338. Gargano reported anger and irritability. Tr. 338. Nurse Sweeney was not sure whether Gargano's irritability was related to his depression or to personality issues. Tr. 339.

Since Gargano did not report other symptoms of depression, Nurse Sweeney suspected that Gargano's irritability was related to personality issues. Tr. 339. Nurse Sweeney explained that anger is not something that is medicated and she offered Gargano a referral for counseling but Gargano declined. Tr. 338, 339. Gargano denied any hypomanic, manic, or psychotic symptoms. Tr. 338. Nurse Sweeney indicated that Gargano was easily confused. Tr. 338.

During a February 3, 2014, visit with Nurse Sweeney, Gargano relayed that he was "really hearing a lot of voices all the time[.]" Tr. 340. Gargano's mood was "down." Tr. 340. Gargano was hearing multiple voices and felt like certain television and radio programs were talking to him. Tr. 340. Gargano had insight into his feelings being abnormal but was continuing to have them. Tr. 340. Gargano's sleep was poor and varied. Tr. 340. At times, he was sleeping 10-12 hours a day and, at other times, he could not sleep. Tr. 340. Gargano reported no mania/hypomania symptoms. Tr. 340. Nurse Sweeney switched Gargano's diagnosis to paranoid schizophrenia due to the presence of psychotic features in the absence of mood issues. Tr. 341. Nurse Sweeney started Gargano on Latuda in place of Seroquel. Tr. 341. Gargano did not think that the Seroquel helped and it made him groggy. Tr. 340.

On March 3, 2014, Gargano saw Nurse Sweeney and reported that "the [L]atuda works much better than the [S]eroquel[.]" Tr. 342. Gargano was no longer having audio hallucinations but he was having paranoid delusions. Tr. 342. He felt that the government was watching him through his electronic devices. Tr. 342. Nurse Sweeney observed that Gargano appeared less blunted and was pleasant. Tr. 343. Nurse Sweeney noted the possibility of sleep apnea.[7] Tr. 342

---

[7] On March 14, 2014, a sleep study was performed. Tr. 347-356. The results of the sleep study showed mild obstructive sleep apnea that was controlled on CPAP therapy. Tr. 349.

On April 1, 2014, Gargano saw Nurse Sweeney and reported that his mood had been "up and down" that month but better on Latuda. Tr. 357. Gargano's audio hallucinations and paranoid symptoms were reduced but he continued to believe he was being monitored through his television and computer but recognized that those thoughts were "not normal." Tr. 357. Gargano was continuing to have difficulty processing information, especially when complicated situations were involved. Tr. 357. Nurse Sweeney observed a change in Gargano's physical appearance over the preceding year, noting that Gargano was dressing very casual and his hair was disheveled and no longer styled. Tr. 357. Nurse Sweeney continued to diagnose paranoid schizophrenia, noting that Gargano's psychotic symptoms had improved on Latuda but he was continuing to suffer negative symptoms of schizophrenia, including cognitive impairments evidenced by difficulty processing information. Tr. 358.

On May 1, 2014, Gargano saw Nurse Sweeney reporting that he was "still having up and down days[.]" Tr. 359. Gargano felt that the Latuda was helping with his paranoid thoughts but he was continuing to have delusions about people monitoring him at his home. Tr. 359. Gargano continued to understand that these were abnormal thoughts but they felt very real to him. Tr. 359. Gargano decreased his Depakote on his own because he was sleeping too much. Tr. 359, 360. There was no mania/hypomania present and Gargano's speech was normal. Tr. 359. Gargano's sleep had improved on the CPAP. Tr. 359. Gargano was continuing to isolate himself, which he indicated was due to his mood. Tr. 359. Because Gargano was continuing to have psychotic features, Nurse Sweeney increased Gargano's Latuda. Tr. 360. Also, Nurse Sweeney increased Gargano's Wellbutrin XL for his mood. Tr. 360. During a May 30, 2014, visit with Nurse Sweeney, Gargano reported that "things are getting better[.]" Tr. 361. Gargano denied audio hallucinations or delusional thinking – he no longer felt that the television was

sending him messages.  Tr. 361.  Gargano was continuing to exhibit a flat affect, which his family was having a difficult time with.  Tr. 361.  Gargano's sleep was better; he was averaging about 8 hours.  Tr. 361.  Nurse Sweeney's assessment was that Gargano appeared more stable.  Tr. 362.  Nurse Sweeney informed Gargano that he would be seeing Kelley Kauffman because Nurse Sweeney was going to be out on leave.  Tr. 362.

On June 30, 2014, Gargano saw Kelley Kauffman, RN, NP.  Tr. 363-364.  Gargano reported that he had been taking it easy and was compliant with his medication. Tr. 363.  He indicated that his audio hallucinations had decreased but he was having visual hallucinations.  Tr. 363.  He was having "feelings that animals and bugs [were] tracking him and reporting back to someone unknown."  Tr. 363.  He said he ignores cameras and reported some paranoia of an unknown threat that he had been trying to discover for over a year.  Tr. 363.  Gargano stated that when he takes his Latuda he feels he needs to pace.  Tr. 363.   The Cogentin was not helping with Gargano's restlessness so Gargano requested an increase.  Tr. 364.  Nurse Kauffman increased Gargano's Cogentin dose and continued his other medication.  Tr. 364.

On July 30, 2014, Gargano saw Nurse Sweeney.  Tr. 365.  Gargano reported that his mood was "[g]ood for the most part[.]"  Tr. 365.   He was continuing to experience akathisia[8] "mostly at night" due to the Latuda but he was not taking his Cogentin regularly.  Tr. 365, 366.  Nurse Sweeney discussed this with Gargano and he agreed to increase his medication compliance.  Tr. 366.  Gargano denied psychotic features.  Tr. 365.  He was continuing to have some tax issues related to his father's business.  Tr. 365.   Gargano was no longer taking Depakote but continued with Cogentin, Latuda and Wellbutrin XL.  Tr. 366.

---

[8] Akathisia, spelled akesthesia in the treatment records, is "a condition of motor restlessness in which there is a feeling of muscular quivering, an urge to move about constantly, and an inability to sit still[.]"  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 42.

During an August 27, 2014, visit with Nurse Sweeney, Gargano indicated that his mood was "okay." Tr. 367. He denied audio hallucinations but continued to have delusional thinking. Tr. 367. He relayed, "I feel like when I see white cars then they are all on the same team or something." Tr. 367. His sleep was okay except when his akathisia was bad. Tr. 367. His Cogentin was not working. Tr. 367. Nurse Sweeney recommended discontinuing Cogentin because it was not effective and starting Benadryl. Tr. 368.

On September 25, 2014, Gargano saw Nurse Sweeney reporting that his mood was "okay but stressed[.]" Tr. 369. Gargano relayed that he was working at Mapleside Farm for the season. Tr. 369. He was enjoying the work but was feeling stressed because he was working Monday through Friday 8:30-6 and unable to find time to meet with his case manager to discuss getting assistance with his medical bills. Tr. 369. However, Gargano did indicate that his mom could drop off paperwork with his case manager and Nurse Sweeney encouraged Gargano to set up a phone appointment with his case manager. Tr. 369. Sweeney indicated that his work was seasonal so he would stop working in November. Tr. 369. Gargano indicated that the audio hallucinations were "less on meds" and he was using music as a distraction from baseline symptoms. Tr. 369. Gargano's sleep was "good" – he was averaging 8 hours. Tr. 369. He denied suicidal and homicidal ideation and other psychotic features. Tr. 369. Nurse Sweeney assessed Gargano as stable, noting he was able to work part time at a seasonal job and was compliant on medication. Tr. 370. She noted he needed assistance with social stressors and would forward a note to his case manager regarding that need. Tr. 370.

On November 10, 2014, Gargano saw Nurse Sweeney and reported that his mood was "not great." Tr. 371. Gargano indicated that performing seasonal work had affected his ability to take his medication so he was having more symptoms. Tr. 371. He was taking Latuda

intermittently because of his work schedule. Tr. 371. He reported an increase in audio hallucinations and paranoia. Tr. 371. Gargano was interested in an injectable form of medication. Tr. 371-372. Nurse Sweeney discontinued Latuda and started Gargano on Invega with a plan to work towards Sustenna. Tr. 372.

On December 1, 2014, Gargano saw Nurse Sweeney and reported that his mood was "okay" since starting on Invega but noted increased sedation and some mild toe cramping. Tr. 373. Gargano no longer believed that he had "vague 'special powers'" but he was having some paranoia. Tr. 373. He explained "he stares out his window and 'feels like there is something bad going to happen to him.'" Tr. 373. Gargano remained somewhat social with friends and he had recently had Thanksgiving dinner with his family. Tr. 373. Gargano felt that his symptoms were more controlled with Invega than Latuda but, because of the sedation caused by the Invega, Gargano was interested in switching to a new medication. Tr. 373. Nurse Sweeney changed Gargano's medication from Invega to Abilify. Tr. 374.

On February 2, 2015, Gargano saw Nurse Kauffman. Tr. 376-377. Gargano was euthymic with a congruent affect. Tr. 376. Gargano reported decreased paranoia and believed that his symptoms were well controlled on his current medication but he was still having instances of increased paranoia when under stress. Tr. 376. Gargano reported drinking to the point of "blacking out" when stressed. Tr. 376. Nurse Kauffman encouraged abstinence and discussed the effects of combining alcohol with medication. Tr. 376. Gargano saw Nurse Kauffman again on February 27, 2015. Tr. 378-379. Gargano reported that the Abilify was causing anxious feelings but did feel that the Abilify was helping manage his psychotic symptoms. Tr. 378. He denied internal restlessness but endorsed feeling that he needed to walk around. Tr. 378. He indicated that his mood was stable with intermittent paranoia that was

manageable. Tr. 378. Gargano reported side effects of anxiety and heart burn. Tr. 379. Because side effects made taking his medication "regularly intolerable," Gargano requested a decrease in his medication rather than changing medications. Tr. 378. Gargano felt that the benefits of staying on Abilify at a reduced dose outweighed risks at the time. Tr. 379. Per Gargano's request, Nurse Kauffman decreased the Abilify dose to decrease the risk of side effects and continued the treatment of his symptoms of psychosis. Tr. 379.

During a medical visit on September 12, 2016, for follow up regarding hypogonadism and back pain after falling down the steps, Gargano reported that he had lost his job because a co-worker had lost something on the job. Tr. 1016-1017. Gargano relayed that he was looking for work. Tr. 1017. During a December 19, 2016, medical visit for follow up regarding back pain, Gargano noted that he was working – moving furniture off and on. Tr. 1013. Gargano was also going to the gym for weight lifting. Tr. 1013. On physical examination, Gargano had a normal mood and affect. Tr. 1014-1015.

Gargano saw Nurse Kauffman on February 10, 2017. Tr. 1034-1035. Gargano reported continued audio hallucinations. Tr. 1034. Gargano was fearful that he was going to lose his ability to get medication because of the new health care act and thought he should wean off his medications. Tr. 1034. After discussions with Nurse Kauffman, Gargano agreed to stay on his medications. Tr. 1034. He felt that his medications were helpful. Tr. 1034. He denied suicidal or homicidal ideation and felt optimistic about his mood, noting that he felt "pretty good." Tr. 1034. Gargano noted though that he was sleeping 12 hours per night but not feeling rested. Tr. 1034. He was dealing with issues pertaining to his father's estate, including tax debt and properties that were in foreclosure. Tr. 1034. He was not getting assistance with managing his father's estate from his half-brothers. Tr. 1034. Nurse Kauffman diagnosed schizophrenia,

noting that Gargano had continued audio hallucinations at baseline, his mood was improved, and he was better able to manage his stressors. Tr. 1035. Nurse Kauffman prescribed Abilify, Wellbutrin, and Cogentin. Tr. 1035.

On May 17, 2017, Gargano saw David Brager, NP, at Center for Families and Children. Tr. 1039-1040. Gargano relayed that he had been off his medications for one month. Tr. 1039. Gargano's mother, however, indicated that Gargano had been off his medications for two or three months. Tr. 1039. Gargano reported paranoid ideation, hypervigilance, restlessness, increased agitation, irritability and he felt that people were reading his thoughts. Tr. 1039. Gargano reported that he had done well on Gedeon. Tr. 1040. Gargano did not like the side effects he experienced when taking Wellburtin and Abilify. Tr. 1040. Nurse Brager discontinued Wellbutrin and Abilify and prescribed Gedeon. Tr. 1040.

The following day, on May 18, 2017, Gargano presented to the emergency room at Lutheran Hospital with his mother for a psychological evaluation. Tr. 725-731. When Gargano arrived at the emergency room, he was pacing and restless, his speech was tangential and rambling, and his thought process was disorganized. Tr. 726. Gargano's mother relayed that Gargano had not taken his medications for three months and had just restarted his medications the day before. Tr. 726, 728. Gargano admitted to drinking for the prior two days and using marijuana, which was possibly laced with something. Tr. 728. Gargano denied suicidal or homicidal thoughts and denied hallucinations. Tr. 728. Gargano was pink slipped and admitted for psychiatric evaluation. Tr. 730. Gargano's diagnosis on admission was bipolar I disorder. Tr. 730. During his hospitalization, Gargano's psychiatric symptoms improved, he was able to participate in unit activities, and comply with activities of daily living. Tr. 732. Gargano was discharged on May 30, 2017, with a diagnosis of mood disorder bipolar disorder I, most recent

episode manic severe with psychotic features. Tr. 732. On the day of his discharge, Gargano denied hallucinations as well as suicidal or homicidal ideation and he appeared future oriented. Tr. 732. Gargano was discharged in stable condition. Tr. 732.

Gargano saw Nurse Brager on May 31, 2017. Tr. 1042-1043. Gargano relayed that he had been hospitalized and reported that his mood was stable on medication. Tr. 1042. Nurse Brager continued Gargano on Depakote, which had been started while Gargano was at Lutheran as a mood stabilizer, and he prescribed Abilify and Cogentin. Tr. 1043.

During a June 12, 2017, visit with Nurse Brager, Gargano was more accepting of the fact that he had schizoaffective disorder versus schizophrenia. Tr. 1044. Gargano relayed that he had separated from his significant other. Tr. 1044. He was working on processing his thoughts and feelings regarding the relationship ending. Tr. 1044. Nurse Brager continued Gargano on Depakote, Abilify and Cogentin. Tr. 1045.

On August 11, 2017, Gargano saw Nurse Kauffman. Tr. 1046-1047. Gargano relayed that things had been really rough. Tr. 1046. He had weaned himself off of Depakote. Tr. 1046. He reported getting into arguments with friends and family and he owed a lot of people money. Tr. 1046. Gargano was experiencing audio hallucinations that were mocking and taunting him, which was preventing him from accomplishing tasks. Tr. 1046. He denied suicidal and homicidal ideation but indicated that some days he was unable to get out of bed and would rather go back to bed than face the day. Tr. 1046. Nurse Kauffman diagnosed schizophrenia, depression, anxiety with possible paranoia and distressful audio hallucination. Tr. 1047. Nurse Kauffman made some adjustments to Gargano's medications. Tr. 1047.

During a September 7, 2017, visit with Nurse Kauffman, Gargano reported being "really down the last few days." Tr. 1048. He relayed that he felt not in control of his life. Tr. 1048.

He was losing all of his father's properties because he did not file something in time; he had increased depression; he was frustrated by multiple denials of social security; he rated his paranoia a 9/10, with 10 being the worst; he felt like he was being judged and watched all the time by family members. Tr. 1048. Nurse Kauffman diagnosed schizophrenia, continued depression and anxiety about stressors. Tr. 1049. She indicated that Gargano had continued psychosis but noted that his psychosis improved when he was on Abilify more regularly. Tr. 1049. Nurse Kauffman continued Gargano's medications. Tr. 1049.

### 2. Opinion evidence

#### a. Treating sources

*Nurse Sweeney – January 2, 2014*

On January 2, 2014, Nurse Sweeney completed a "Mental Impairment Questionnaire (RFC & Listings)." Tr. 324-327. Nurse Sweeney indicated in the Questionnaire that she had seen Gargano since July 2013 and that Gargano had a diagnosis of bipolar I disorder and a GAF score of 40. Tr. 324. She offered the following information regarding his "treatment and response:"

> On Seroquel & Depakote for mood stabilization & Wellbutrin XL for depression. [N]o recent hypomanic/manic episodes but recent episodes of severe depression marked by anger/irritability.

Tr. 324. Nurse Sweeney indicated that Gargano's medication caused drowsiness, fatigue, and lethargy. Tr. 324. Nurse Sweeney indicated that the following clinical findings demonstrated the severity of Gargano's impairment and symptoms – irritable during appointments; difficult time concentrating; often confused; needs repeated education on medication and mental health; very concrete in his thinking; and unable to cope with stressors. Tr. 324. Nurse Sweeney opined

that Gargano was unable to function at a level needed to maintain employment because of his diagnosis of bipolar disorder that was expected to last for more than 12 months. Tr. 324.

As part of the Questionnaire, Nurse Sweeney opined that Gargano had marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence or pace; and three episodes of decompensation within a 12 month period, each of at least two weeks duration. Tr. 327.

Nurse Sweeney also rated Gargano's functional abilities in specific categories within the areas of "understanding and memory limitations;" "sustained concentration and persistence limitations;" "social interaction limitations;" and "adaptation limitations." Tr. 325-326. The rating choices were "unlimited or very good," "limited but satisfactory," "seriously limited, but not precluded," "unable to meet competitive standards," and "no useful ability to function." Tr. 325.

In the area of "understanding and memory," Nurse Sweeney rated Gargano's ability to understand and remember very short and simple instructions as "unlimited or very good" and his ability to remember locations and work-like procedures and understand and remember detailed instructions as "seriously limited, but not precluded." Tr. 325. She explained her ratings, noting that Gargano "has difficulty [with] concentration [and] memory when mood [at] extremes." Tr. 325.

In the area of "sustained concentration and persistence," Nurse Sweeney rated Gargano's ability to carry out very short and simple instructions as "limited but satisfactory." Tr. 325. Nurse Sweeney rated Gargano's ability in the following seven categories as "seriously limited, but not precluded" – carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; sustain an ordinary routine without

special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; and perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 325. She rated Gargano as "unable to meet competitive standards" in the following two categories – manage regular attendance and be punctual within customary tolerances and complete a normal workday and workweek without interruptions from psychologically based symptoms. Tr. 325. She explained her ratings by noting that, "due to extreme moods related to bipolar [disorder,] [Gargano] is extremely limited in ability to handle normal work activities (i.e. concentration, persistence, attention, schedule)[.]" Tr. 325.

In the area of "social interaction," Nurse Sweeney rated Gargano as "seriously limited, but not precluded" in his ability to ask simple questions or request assistance and "unable to meet competitive standards" in the following four categories - interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Tr. 326. Nurse Sweeney explained her ratings, noting "[due to] bipolar [disorder] [Gargano] is extremely limited in ability to behave appropriately [with] co-workers or general public." Tr. 326.

In the area of "adaptation," Nurse Sweeney rated Gargano as having "limited but satisfactory" ability to travel in unfamiliar places or use public transportation and she rated Gargano as "seriously limited, but not precluded" in his ability to respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and

set realistic goals or make plans independently of others.  Tr.  326.  She explained her ratings, noting "[Gargano] has difficulty processing information [due to] bipolar [disorder.]"  Tr. 326.

Nurse Sweeney indicated that Gargano did not have a low IQ or reduced intellectual functioning.  Tr. 326.  She opined that Gargano's impairments or treatment would cause him to be absent form work more than four days per month and his symptoms would cause him to be off-task 25% of an 8-hour workday.  Tr. 327.  Also, she opined that Gargano's symptoms would cause him to be tardy to work more than four times per month.  Tr. 327.

*Nurse Sweeney, co-signed by M.D. – March 3, 2014*

On March 3, 2014, Nurse Sweeney completed a Mental Status Questionnaire.  Tr. 334-336.  The March 3, 2014, Questionnaire was co-signed by an M.D.  Tr. 336.  However, the name of the M.D. is not identifiable from the signature.  Tr. 336.  In his brief, Gargano indicates that the March 3, 2014, questionnaire was signed by Nurse Sweeney and Dr. Hunt.  Doc. 12, p. 6.  Gargano's mental status was described as follows: his appearance was pale and somewhat disheveled; his flow of conversation and speech were normal rate, rhythm and volume; his mood was "good" and his affect was congruent on that date but in the past his affect was appropriate; he had anxiety about his normal life stressors; he had paranoid delusions that the government was watching him through technology, he felt like he was thought projecting and at times felt like the television and radio were talking to him and sending him messages so he was having delusions of reference; he was alert and oriented; he had difficulty with concentration and short term memory because at times he had difficulty telling reality from psychosis; he had impairment with abstract reasoning; he had good insight into psychotic features but only when symptoms are well controlled; his judgment was dependent on the level of psychosis; and there were no substance abuse issues.  Tr. 334.

Nurse Sweeney indicated that Gargano's diagnosis was paranoid schizophrenia. Tr. 335. Gargano's treatment included Latuda to decrease his psychosis but he was still having some delusions of reference and paranoia. Tr. 335. Gargano was also taking Wellbutrin to stabilize his mood. Tr. 335.

Nurse Sweeney offered her opinion regarding Gargano's functional abilities. Tr. 335. She opined that Gargano had difficulty with memory and comprehension due to psychosis. Tr. 335. He had severe difficulty in maintaining attention due to psychosis. Tr. 335. He had difficulty sustaining concentration or persisting at tasks due to psychosis. Tr. 335. He had difficulty interacting socially due to paranoia and psychosis and difficulty adapting due to psychosis. Tr. 335. In response to an inquiry regarding how Gargano would "react to the pressures, in work settings or elsewhere, involved in simple and routine, or repetitive, tasks," Nurse Sweeney stated that Gargano "would react very poorly to any work or life stressors as they would likely [increase] paranoia [and] psychosis." Tr. 335.

### *Nurse Kauffman and Dr. Hunt – April 2015*

In April 2015, Nurse Kauffman and Dr. Andrew Hunt, M.D., completed a "Mental Impairment Questionnaire." Tr. 384-385. Nurse Kauffman signed the Questionnaire on April 2, 2015, and Dr. Hunt signed the Questionnaire April 9, 2015. Tr. 385. They indicated that Gargano had been with the agency since July 2013 and with Nurse Kauffman in February 2015. Tr. 384. The space for listing "treating source(s)" was left blank. Tr. 384. Gargano's diagnosis was listed as schizophrenia. Tr. 384. They indicated that Gargano was prescribed Abilify, Wellbutrin XL, and Cogentin, with restlessness listed as a side effect. Tr. 384. The following clinical findings were listed as demonstrating the severity of Gargano's impairment and symptoms – paranoia, disorganization, delusions of "special powers." Tr. 384. Nurse Kauffman

and Dr. Hunt indicated that Gargano's prognosis was "unclear, may be good with continued adherence to medication." Tr. 384. They opined that Gargano's impairment lasted or was expected to last at least 12 months. Tr. 384.

Nurse Kauffman and Dr. Hunt also rated Gargano's functional abilities in specific categories within the areas of "sustained concentration and persistence limitations;" "understanding and memory limitations;" "social interaction limitations;" and "adaptation limitations." Tr. 384-385. The rating choices were "unlimited or very good," "limited but satisfactory," "seriously limited, but not precluded," "unable to meet competitive standards," and "no useful ability to function." Tr. 384.

In the area of "sustained concentration and persistence," Nurse Kauffman and Dr. Hunt rated Gargano's ability to carry out very short and simple instructions; manage regular attendance and be punctual within customary tolerances; and perform at a consistent pace without an unreasonable number and length of rest periods as "seriously limited, but not precluded." Tr. 384. They rated Gargano as "unable to meet competitive standards" in the following categories – carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms. Tr. 384.

In the area of "understanding and memory," Nurse Kauffman and Dr. Hunt rated Gargano's ability to understand and remember very short and simple instructions as "seriously limited, but not precluded" and "unable to meet competitive standards" in the following

categories – remember locations and work-like procedures and understand and remember detailed instructions.  Tr. 385.

In the area of "social interaction," Nurse Kauffman and Dr. Hunt rated Gargano's ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness as "limited but satisfactory."  Tr. 385.  They rated Gargano as "seriously limited, but not precluded" in his ability to interact appropriately with the general public; ask simple questions or request assistance; and accept instructions and respond appropriately to criticism from supervisors.  Tr. 385.   They indicated that Gargano was "unable to meet competitive standards" in the following category – get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 385.

In the area of "adaptation," Nurse Kauffman and Dr. Hunt rated Gargano as "seriously limited, but not precluded" in his ability to be aware of normal hazards and take appropriate precautions.  Tr. 385.   They rated Gargano as "unable to meet competitive standards" in the following categories – respond appropriately to changes in the work setting and set realistic goals or make plans independently of others.  Tr. 385.

Nurse Kauffman and Dr. Hunt opined that, on average, Gargano's impairments or treatment would cause him to be absent from work more than four days per month.  Tr.  385. Also, they opined that, on average, Gargano's symptoms would cause him to be off-task more than 25% of an 8-hour workday.  Tr. 385.

### b.   Consultative examiner

On October 8, 2013, Amber L. Hill, Ph.D., met with Gargano for the purpose of conducting a psychological evaluation.[9] Tr. 275-286.  When asked why he applied for social

---

[9] Per Gargano's request, Gargano's mother was present during the evaluation.  Tr. 275.

security disability benefits, Gargano responded, "Because of the mental state that I'm in. I can't keep my train of thought." Tr. 275. Dr. Hill's diagnoses included bipolar disorder, most recent episode depressed, severe with psychotic features; opioid dependence with physiological dependence, in reported full sustained remission; alcohol dependence with physiological dependence; and cannabis dependence with physiological dependence. Tr. 282-283. Dr. Hill assigned a GAF score of 50. Tr. 283. Dr. Hill felt that Gargano's prognosis was guarded at the time because he was "engaged in pharmacological management related to his reported mental health concerns." Tr. 283. She indicated that "he could benefit from additional services such as counseling and therapy services" and noted that he was not participating in any type of drug or alcohol treatment pertaining to his reported remission from opioid dependence and abuse of alcohol and marijuana. Tr. 283.

Dr. Hill concluded that:

Based on the claimant's report of a current major depressive episode where there has previously been at least one manic episode that are not better accounted for by schizoaffective disorder, his reported symptoms satisfy criteria for bipolar I disorder, most recent episode depressed, and is given the specifiers of severe with psychotic features due to his report of auditory and visual hallucinations that are mood congruent psychotic features and also includes paranoid ideation.

Tr. 283. Dr. Hill indicated that Gargano also had additional psychosocial stressors related to problems with his family. Tr. 284. Dr. Hill noted that Gargano had instability in interpersonal relationships, self-image and affects. Tr. 284. Gargano indicated that medication was helpful in controlling his manic episodes and psychotic features. Tr. 284. However, Dr. Hill felt that Gargano could benefit from additional mental health treatment such as counseling and therapy services and alcohol and drug services. Tr. 284.

With respect to Gargano's work-related mental abilities, Dr. Hill opined:

1. Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.

   The claimant appears able to understand, remember, and carry out instructions as evidenced by his presentation during the clinical interview, his performance on the mental status exam tasks, and his report of daily functioning. However, if the claimant is not taking his medication as prescribed or is experiencing a manic episode the claimant would likely be extremely limited in his ability to understand, remember, and carry out instructions related to his psychotic features.

2. Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.

   The claimant appears able to maintain attention and concentration, maintain persistence and pace, and perform simple and multi-step tasks as evidenced by his presentation during the clinical interview, his reported work and academic history, and his reported daily functioning. However, the claimant is likely limited in his ability in all of these areas as he is not taking his medication as prescribed or is experiencing psychotic features with a manic episode.

3. Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.

   The claimant is likely able to respond appropriately to supervisors and to coworkers within a work setting based on his socially appropriate manner of interacting within the clinical interview setting. However, it is important to note that if the claimant is actively experiencing a manic episode, including psychotic features, the claimant is likely not able to respond appropriately to supervisors and to coworkers within a work setting related to his auditory and visual hallucinations and other psychotic features. He would further be limited within a manic episode and is likely unable to respond appropriately if ever returning to his work setting that he has worked within for the past 12 years with his father related to his unresolved conflict and anger with his father. The claimant could possibly benefit from counseling and therapy in this area to assist with improving limitations. The claimant also reports an extensive history related to legal involvement.

4. Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.

   The claimant is likely limited in his ability to respond appropriately to work pressures within a work setting based on his report of paranoid ideation and other psychotic features that appear to be currently medication controlled. The claimant could possibly benefit from additional metal health services such as

counseling and therapy to increase coping skills and address limitations in this area. Further, the claimant has an extensive alcohol and drug history of which he is only reporting remission from his opioids and continues to use alcohol and marijuana, which could further exacerbate limitations in this area.

Tr. 285-286.

### c. State agency reviewers

*Mel Zwissler, Ph.D.*

On October 10, 2013, state agency reviewing psychologist Mel Zwissler, Ph.D., completed a Psychiatric Review Technique and Mental RFC Assessment. Tr. 68-71.[10] As part of the Psychiatric Review Technique, Dr. Zwissler opined that Gargano had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation, each of extended duration. Tr. 69.

In assessing Gargano's Mental RFC, Dr. Zwissler found that Gargano had no understanding and memory limitations and no social interaction limitations. Tr. 70-71. Dr. Zwissler concluded that Gargano had limitations in sustained concentration and persistence and adaptation. Tr. 70-71.

With respect to limitations in the area of sustained concentration and persistence, Dr. Zwissler opined that Gargano was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 70-71. Dr. Zwissler found that Gargano was not significantly limited in his ability to carry out very short

---

[10] Dr. Zwissler's opinions are also found at Tr. 78-81.

and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and make simple work-related decisions. Tr. 70-71. Dr. Zwissler further explained the limitations in this area, stating that Gargano could "carry out simple routine tasks without strict time demands." Tr. 71.

With respect to adaptation limitations, Dr. Zwissler opined that Gargano was moderately limited in his ability to respond appropriately to changes in the work setting ; moderately limited in his ability to set realistic goals or make plans independently of others; not significantly limited in his ability to be aware of normal hazards and take appropriate precautions; and not significantly limited in his ability to travel in unfamiliar places or use public transportation. Tr. 71. Dr. Zwissler further explained the limitations in this area, stating that Gargano could "adapt to minor expected and infrequent changes. He could use help setting more realistic goals to be more independent and less reliant on [his] [m]other and girlfriend." Tr. 71.

### _Leslie Rudy Ph.D._

Upon reconsideration, on December 13, 2013, state agency reviewing psychologist Leslie Rudy, Ph.D., completed a Psychiatric Review Technique and Mental RFC Assessment. Tr. 92-93, 94-97.[11] As part of the Psychiatric Review Technique, like Dr. Zwissler, Dr. Rudy opined that Gargano had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation, each of extended duration. Tr. 93.

---

[11] Dr. Rudy's opinions are also located at Tr. 105-110.

In assessing Gargano's Mental RFC, Dr. Rudy found that Gargano had understanding and memory limitations, sustained concentration and persistence limitations, social interaction limitations, and adaptation limitations. Tr. 95-96.

With respect to limitations in the area of understanding and memory, Dr. Rudy opined that Gargano was moderately limited in his ability to understand and remember detailed instructions and not significantly limited in his ability to understand and remember very short and simple instructions. Tr. 95. Dr. Rudy found no evidence of limitation in ability to remember locations and work-like procedures. Tr. 95. Dr. Rudy further explained the limitations in this areas, stating that Gargano "reports being able to follow short/simple instructions, must be reminded to care for pet. He does live alone. Can do one and two step tasks." Tr. 95.

With respect to limitations in the area of sustained concentration and persistence, Dr. Rudy opined that Gargano was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 95-96. Dr. Rudy found that Gargano was not significantly limited in his ability to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and make simple work-related decisions. Tr. 95-96. Dr. Rudy further explained the limitations in this area, stating that Gargano could "carry out simple routine tasks without strict time demands. He reports that he can watch TV but doesn't pay attention. He has [history of] mood swings and excessive sleep." Tr. 96.

With respect to social interaction limitations, Dr. Rudy opined that Gargano was markedly limited in his ability to interact appropriately with the general public; moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and not significantly limited in his ability to ask simple questions or request assistance. Tr. 96. Dr. Rudy further explained the limitations in this area, stating that Gargano "neglects ADLs and has mood swings to mania. He has also reported some paranoid delusions. He can do work that doesn't involve contact with the general public and only superficial contact with coworkers and supervisors." Tr. 96.

With respect to adaptation limitations, Dr. Rudy opined that Gargano was moderately limited in his ability to respond appropriately to changes in the work setting or in his ability to set realistic goals or make plans independently of others. Tr. 96. Dr. Rudy also opined that Gargano was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions or in his ability to travel in unfamiliar places or use public transportation. Tr. 96. Dr. Rudy further explained the limitations in this area, in narrative form that Gargano "can adapt to minor expected and infrequent changes. He could use help setting more realistic goals to be more independent and less reliant on [his] [m]other and girlfriend. [Gargano] has been [diagnosed] with DAA but cut down per report." Tr. 96.

## C. Testimonial evidence

### 1. Plaintiff's testimony

Gargano was represented and testified at the April 2015 and November 2017 hearings. Tr. 41-57, 59, 408, 412-430.

Gargano resided in his own home but he had his mail sent to his mother's house to make sure he does not lose anything important. Tr. 41-42. Gargano explained that he would be unable to work a regular 40 hour per week job because he could not keep a set schedule due to his irregular sleep patterns. Tr. 48. Gargano indicated that his medication affected his sleep. Tr. 49, 52-53. At times, Gargano is unable to sleep at all due to his schizophrenia causing him to be manic for days. Tr. 53. At other times, Gargano sleeps all the time and cannot get out of bed. Tr. 53. Gargano also indicated that he would have issues getting along with people at a job because he does not have the ability to always listen and isolates himself at times. Tr. 49-50. Gargano has paranoia about people and insects or animals watching or listening to him and/or thinks that people know what he is thinking. Tr. 49-50, 53-54.

When Gargano is depressed he estimated being in bed about 12 hours a day, on the couch about 6 hours a day and in a chair about 2 hours a day. Tr. 54-55. He does not use the phone or television and does not have people over. Tr. 54. Sometimes he can read a book or comics or play an instrument but sometimes he cannot do those things. Tr. 54-55. He tries to keep himself occupied because he feels crazy – like pulling all his hair out or jumping off bridges or jumping into rivers. Tr. 55. When Gargano is in a manic state, he feels unstoppable. Tr. 55-56. Gargano does not know what triggers a manic state. Tr. 56. Gargano could not say whether his manic behavior was tied to a medication change. Tr. 56. He stated that he follows his doctors' orders regarding treatment and has always been honest with the effects and side effects of medication. Tr. 57.

Gargano had past problems with abusing pain pills but he went to rehab, NA and AA. Tr. 50-51. He was still using marijuana every so often to help him sleep and to help increase his

appetite. Tr. 51-52. He indicated he did not have much of an an appetite and did not prepare meals for himself. Tr. 52. At the hearing he was at a good weight of 200 pounds but in the past he had been down to 140 pounds. Tr. 52.

*November 2017 hearing*

Gargano was 34 at the time of the hearing. Tr. 413. He continued to live in his own home but had his mail sent to his mother's address. Tr. 412-413. Gargano had a dog. Tr. 414. Gargano had a girlfriend that he had been seeing for three or four years. Tr. 424. He met her when he was working at the farm. Tr. 424.

Gargano explained that he inherited a number of properties from his father when his father passed away but there is a large amount of debt owed. Tr. 414-419. Gargano was trying to maintain the properties and use some rent to pay back taxes owed on the various properties but he was having a difficulty time doing so. Tr. 414-419. One of the properties was lost in foreclosure and another was in foreclosure. Tr. 416. Gargano also indicated that the government was claiming that he owed money for debt accumulated in connection with his father's business. Tr. 418.

The ALJ asked Gargano to explain in his own words why he felt he was disabled. Tr. 421. Gargano indicated that things stress him out and he tends to lose track of the days. Tr. 421. He explained that there are times when he is in bed for a week, with the exception of using the restroom or feeding his dog. Tr. 421. He is often unable to recall what happens during those periods. Tr. 421. Gargano tries to comply with taking his medications as prescribed. Tr. 422. To help him remember his medication, he started using a folder with pockets and dates that is filled by his doctor's office. Tr. 422. Gargano had been using the new medication reminder system for about three months. Tr. 422. Since using the new reminder system, Gargano missed

about a week's worth of medication per month. Tr. 422. Sometimes Gargano just has a hard time taking his medication even when people remind him to do so. Tr. 422-424. In addition to taking pills, once a month Gargano receives his medication through an injection at a hospital. Tr. 423-424. Gargano's girlfriend or mother remind him about his appointments. Tr. 424.

Gargano feels that people are judging him and are condescending. Tr. 422-423. Gargano indicated that he felt that he had worse events happen since he was present for the April 2015 hearing. Tr. 424-425. His father's debt that the government was claiming that he owed was stressing him out. Tr. 425-429. Gargano also explained that he felt stressed because his family did not talk to him; he was the outcast in the family. Tr. 425. Gargano stated that he felt that people were telling him to shut up and he asked the ALJ if he heard it as well. Tr. 429. The ALJ indicated he could hear Gargano but nothing else. Tr. 429.

## 2. Vocational Expert

Vocational Expert ("VE") Robert Mosely testified at the hearing and the November 2017 hearing.[12] Tr. 430-434. The VE described Gargano's past work as a stock clerk as a heavy, semi-skilled job and his past work as a cashier II as a light, unskilled. Tr. 431. The ALJ asked the VE to assume a hypothetical individual who can perform work at all exertional levels; perform simple tasks in a setting with occasional changes; perform goal-oriented work but cannot work at a production rate pace; and can interact with supervisors and co-workers if that interaction is limited to speaking and signaling but cannot interact with the public. Tr. 431-432. The VE indicated that the described individual would be unable to perform Gargano's past work but there were other jobs that could be performed, including (1) cleaner II, a medium, unskilled

---

[12] Vocational Expert Deborah Lee testified at the hearing and the April 2015 hearing. Tr. 57-61.

position; (2) laundry worker II, a medium, unskilled position; and (3) laborer, stores, a medium, unskilled position.[13]  Tr. 432.

Next, the ALJ asked the VE to consider a hypothetical individual who would be off task 20% of the time.  Tr. 432-433.  The VE indicated that the hypothetical worker would not be able to maintain or retain employment in any job in the local or national economy.  Tr. 433.  In response to additional questioning from the ALJ, the VE indicated that a hypothetical worker who would be absent from work two days per month on an ongoing basis would not be able to maintain or retain employment in any job in the local or national economy.  Tr. 433.

Gargano's counsel asked the VE whether a hypothetical individual who occasionally was unable to understand, remember or carry out instructions would be able to perform unskilled work.  Tr. 433-434.  The VE indicated that the hypothetical individual would be unable to maintain unskilled employment.  Tr. 434.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[14] . . . .

---

[13] The VE provided national job incidence data for the jobs identified.  Tr. 432.

[14] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[15] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[16] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[15] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[16] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his December 7, 2017, decision, the ALJ made the following findings:[17]

1. Gargano meets the insured status requirements through December 31, 2015.  Tr. 392.

2. Gargano has not engaged in substantial gainful activity since May 15, 2013, the alleged onset date.  Tr. 392.  Gargano did perform work after the alleged disability onset date but the work activity did not rise to the level of substantial gainful activity.  Tr. 392.

3. Gargano has the following severe impairments: schizophrenia and bipolar disorder. Tr. 392.

4. Gargano does not have an impairment or combination of impairments that meets or medically equals the severity of the Listings.  Tr. 392-394.

5. Gargano has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: can perform simple tasks in a setting with occasional changes; can perform goal-oriented work but cannot work at a production rate pace; can interact with supervisors and coworkers if that interaction is limited to speaking and signaling but cannot interact with the public.  Tr. 394-397.

6. Gargano is unable to perform any past relevant work.  Tr. 398.

7. Gargano was born in 1983 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 398.

8. Gargano has at least a high school education and is able to communicate in English.  Tr. 398.

9. Transferability of job skills is not material to the determination of disability.  Tr. 398.

10. Considering Gargano's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Gargano can perform, including, cleaner II, laundry worker II, and laborer, stores.  Tr. 398-399.

---

[17] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Gargano had not been under a disability, as defined in the Social Security Act, from May 15, 2013, through the date of the decision. Tr. 399.

## V. Plaintiff's Arguments

Gargano contends that reversal and remand is warranted because the ALJ did not properly analyze the medical evidence offered by treating sources and the consultative examining psychologist. Doc. 12, pp. 16-28.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.    Reversal and remand is not warranted**

Gargano challenges the ALJ's weighing of the medical opinions offered by Nurse Sweeney, Nurse Kauffman, Dr. Hunt, and Dr. Hill.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for the weight given to the opinion. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).   In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).   However, the "good reasons must be supported by the

evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'" *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544). Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'" *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).

Where there is no ongoing treatment relationship, an opinion is not entitled to deference or controlling weight under the treating physician rule. *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).

Additionally, not all medical sources are "acceptable medical sources." *See* 20 C.F.R. § 404.1513. For example, nurse practitioners are medical sources but they are not considered "acceptable medical sources." *Id.* However, the opinion of a medical source who is not an "acceptable medical source" who has seen a claimant in her professional capacity is relevant evidence. SSR 06-03p, 2006 WL 2329939, * 6 (August 9, 2006). SSR 06-03p provides guidance as to how opinions of medical sources who are not "acceptable medical sources" are to be considered, stating,

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical

sources who are not 'acceptable medical sources' [and] [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or a subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p, 2006 WL 2329939, * 6.

*Nurse Sweeney*

The ALJ discussed and weighed Nurse Sweeney's opinion, stating:

The undersigned accords partial weigh[t] to the opinion of nurse practitioner Sweeney dated January 2, 2014 (exh. 6F; see also exh. 8F, p. 4).[18] Although Ms. Sweeney was not an acceptable source for rendering a medical source statement, she had been treating the claimant for six months as the time she rendered her opinion (exh. 6F). Ms. Sweeney opined that the claimant would be off task more than four days per month, up to 25% of the work day, tardy at least four days per month, and have marked to extreme limitations in all areas of mental functioning (exh. 6F p. 4). Furthermore, Ms. Sweeney opined that the claimant was not employable. The undersigned notes that the issue of disability is reserved for the Commissioner. Ms. Sweeney's opinion is not consistent with her treatment notes. For example, Ms. Sweeney indicated that "due to extreme moods related to bipolar disorder, client is extremely limited in ability to handle normal work activities (i.e. concentration, persistence, attention, schedule[)]" and due to his bipolar disorder the claimant was "extremely limited in ability to behave appropriately with co-workers or general public["] [exh. 6F). While Ms. Sweeney's treatment notes document the claimant's symptoms the day the opinion was rendered, the totality of her records document that he did well with a prescribed course of treatment, and declines were concurrent with non-compliance (exh. 3F, 8F). Furthermore, that decline was later attributed to difficulty with medication compliance (exhs. 8F, p. 7, 13F, p. 18).

Tr. 396. As correctly noted by the ALJ, Nurse Sweeney is not an acceptable medical source.

Thus, her opinions were not entitled to deference under the treating physician rule. Nevertheless, consistent with the regulations, the ALJ provided sufficient explanation for his decision to assign only partial weight to her opinions. In doing so the ALJ recognized the existence of a treatment relationship but found and explained that her extreme limitations were not consistent with

---

[18] Exhibit 8, pp. 3-5 (Tr. 334-336) is Nurse Sweeney's March 3, 2014, Mental Status Questionnaire.

treatment records reflecting that Gargano did well when he followed a prescribed course of treatment but declines were observed when Gargano was not compliant with taking his medications. *See e.g.,* 371-371 (increased symptoms observed over past month related to medication compliance issues – not taking medication due to work schedule); Tr. 726 (at time of psychiatric hospitalization in May 2017, Gargano had not taken his medication for three months). When weighing the evidence, it is not improper for an ALJ's to take into account a claimant's lack of compliance with prescribed medical treatment. *See e.g., Biestek v. Commr. of Soc. Sec.*, 880 F.3d 778, 789 (6th Cir. 2017) *cert. granted sub nom. Biestek v. Berryhill*, 138 S.CT. 2677 (2018).

Gargano claims that discounting a medical opinion because it is inconsistent with the provider's own treatment records is error, arguing that by doing so the ALJ impermissibly substituted his lay opinion for that of the medical provider. However, the ALJ did not substitute his judgment for that of a treating source. Rather, consistent with the regulations, the ALJ considered Nurse Sweeney's opinions and assessed the consistency of her opinions with the record as whole, which included treatment records demonstrating improvement with a prescribed course of treatment. *See e.g.*, Tr. 320-321, 600, 604, 606, 608. Gargano argues that the medical records do not simply show that he did well with a prescribed course of medication or that declines occurred with non-compliance. He contends that they also show repeated episodes of depression, mania, paranoia and hallucinations. While it is correct that Gargano's medical treatment records document instances of the foregoing, the ALJ did not fail to consider Gargano's medical treatment history, including evidence documenting the foregoing mental health issues and symptoms. Tr. 394-396. Thus, Gargano's argument amounts to the request that this Court consider the case de novo. However, it is not for this court to "try the case *de*

*novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Further, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Here, while Gargano disagrees with the ALJ's weighing and consideration of the evidence, Gargano has not shown that the ALJ's finding that Nurse Sweeney's extreme functional limitations were inconsistent with medical records is unsupported by substantial evidence. Nor has Gargano shown that the ALJ ignored evidence or improperly relied on his own lay analysis of the raw medical data. The ALJ weighed the opinion evidence in light of the entirety of the record.

Additionally, as correctly observed by the ALJ, Nurse Sweeney's opinion that Gargano was unemployable is an issue reserved to the Commissioner. *See Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 505 (6th Cir. 2013) (unpublished) ("If the treating physician . . . submits an opinion on an issue reserved to the Commissioner – such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors – [the ALJ's] decision need only explain the consideration given to the treating source's opinion.") (internal quotations and citations omitted). Thus, that opinion was not entitled to any particular weight. *Id.* Gargano notes that Nurse Sweeney's opinion also addressed his mental impairments and functional limitations and thus suggests that discounting Nurse Sweeney's opinion because it contained an opinion on an issue reserved to the Commissioner was error. However, as outlined and discussed above, the ALJ did not discount the opinion based solely on that reason.

Considering the foregoing, the Court finds that the ALJ's analysis regarding the weight assigned to Nurse Sweeney's is sufficient under the regulations and Gargano has not shown that the ALJ's reasons are unsupported by substantial evidence.

*Nurse Kauffman and Dr. Hunt*

The ALJ discussed and weighed the opinion rendered by Nurse Kauffman and Dr. Hunt, stating:

> The undersigned accords partial weight to the April 2015 opinion of nurse practitioner Kelley Kauffman, that was subsequently signed by Andrew Hunt, M.D., (exh. 12F). They indicated that the claimant experienced paranoia, disorganization and delusions of power as part of his diagnosis of schizophrenia. They indicate that the claimant had an unclear prognosis, maybe good, with continued adherence to medication, but that his impairment lasted or was expected to last at least 12 months (exh. 12F). Consequently, they opined that the claimant was seriously limited or unable to meet competitive standards in nearly all areas of functioning (exh. 12F). Lastly, they opined that the claimant would be off work more than four days per month, and would be off-task more than 25% of an eight-hour workday.
>
> The undersigned notes that there is no evidence of Dr. Hunt ever treating the claimant, or signing off on treatment notes. Although Ms. Kauffman's statement that the claimant had been a patient at Centers for Families and Children for two years at the time the decision was rendered, treatment notes suggest that she had just begun a treating relationship with the claimant in January 2015 (exh. 11F p. 3). Prior to that point, Ms. Sweeney was the claimant's nurse, and Ms. Kauffman had treated the claimant on one occasion in June (exhs. 10F p. 7; *see* duplicates at exh. 13F). Additionally, Ms. Kauffman's treatment notes in March 2015 indicated that claimant's symptoms were well managed with medication, however the claimant was struggling to remain compliant because of side effects including anxiety and heart burn (exh. 11F p. 7).

Tr. 396-397.

Like Nurse Sweeney, Nurse Kauffman is not an acceptable medical source. Also, as indicated, in discounting the opinion of Nurse Kauffman and Dr. Hunt, consistent with the regulations, the ALJ considered the extent of the treatment relationship, i.e., no record of Dr. Hunt treating Gargano and evidence that Nurse Kauffman had only recently started to treat

Gargano. Gargano does not contend that these findings are unsupported by the record. Rather, he argues that there is no evidence that Nurse Kauffman and Dr. Hunt did not have access to all of Gargano's medical records from the Center for Families and Children when they prepared their opinion. While they may have had access to all of Gargano's records, Gargano has not shown that it was improper for the ALJ to take into account the limited nature of the treatment relationship(s) when weighing the opinion.

Gargano also takes issue with the ALJ's decision to provide the most weight to the opinion of the state agency examining psychologist, who reviewed records covering a limited period of time. The ALJ explained that great weight was assigned to the opinion of the state agency reviewing psychologist Dr. Rudy because the ALJ found her opinion to be consistent with the record, which included evidence that Gargano did well when adhering to a prescribed course of medical treatment. Tr. 397. Although Dr. Rudy did not have an opportunity to review the medical records for the entire period at issue, the ALJ reviewed the entirety of the record when weighing the evidence, including later dated treatment records and medical opinion evidence, and found Dr. Rudy's opinion "consistent with the record." Tr. 397. Accordingly, the Court finds no reason to find that it was error for the ALJ to assign the most weight to Dr. Rudy's opinion. *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence that developed after the issuance of those opinions); *see also Pence v. Comm'r of Soc. Sec.*, 2014 WL 1153704, *13 (N.D. Ohio Mar. 20, 2014) (finding no error where the ALJ explained that weight was given to non-treating physicians' opinions because they were generally consistent with evidence of record and where the ALJ considered relevant evidence that was developed after the issuance those opinions).

Considering the foregoing, the Court finds that the ALJ did not err when weighing the opinions rendered by Nurse Kauffman and Dr. Hunt and Gargano has not shown that the ALJ's reasons are unsupported by substantial evidence.

*Dr. Hill*

The ALJ discussed and weighed the opinion rendered by Dr. Hill, the consultative examining psychologist, stating:

> The undersigned accords partial weight to Dr. Hill's October 2013 opinion (exh. 3F). Dr. Hill opined that the claimant appeared to understand, remember and carry out instructions based on his presentation during the interview. She indicated the claimant appeared to be able to maintain attention, concentration persistence and pace to perform simple and multi-step tasks as evidenced by his presentation, reported work, academic history and reported daily functioning. He could respond appropriately to supervisors and co-workers. Lastly, she opined that the claimant "is likely limited in his ability to respond appropriately to work pressures within a work setting based on his report of paranoid ideation and other psychotic features that appear to be currently medication controlled." Dr. Hill qualified her opinions to state that if the claimant were non-compliant with medication or experiencing a manic episode he would be extremely limited in his abilities and functioning. The undersigned accords Dr. Hill's opinion partial weight because she qualified her opinion with statements based on a presentation that was not before her at the evaluation. The statements appear to be based on the claimant's reports of functioning.

Tr. 397.

Contrary to Gargano's contention, the ALJ's finding that Dr. Hill's opinion was based on Gargano's subjective complaints was not pure speculation. For example, Dr. Hill stated "Based on the <u>claimant's report</u> of a current major depressive episode that are not better accounted for by schizoaffective disorder <u>his reported</u> symptoms satisfy criteria for bipolar I disorder, most recent episode depressed, and is given the specifiers of severe with psychotic features due to <u>his report</u> of auditory and visual hallucinations . . ." Tr. 283 (emphasis supplied). And she stated, "The claimant is likely limited in his ability to respond appropriately to work pressures within a work setting based on <u>his report</u> of paranoid ideation and other psychotic features that appear to be

currently medication controlled." Tr. 285 (emphasis supplied). Further, while it is understandable that a physician will hear and rely on subjective statements from a patient, it is not improper for an ALJ to take into account and discount an opinion founded primarily on a claimant's subjective statements. *See Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 629 (6th Cir. 2016) ("Regardless of the inherent subjectivity in the field of psychiatry, a doctor cannot simply report what his patient says and re-package it as an opinion."). Additionally, the ALJ did not discount Dr. Hill's opinion solely on the basis that it was based on subjective reports from Gargano. The ALJ found that Dr. Hill's statements were qualified based on a presentation that was not before her, e.g., Dr. Hill made statements that <u>if</u> Gargano was non-compliant he would be extremely limited but, she found that, based on his presentation during the interview, Gargano appeared less limited. Tr. 284-285. While Dr. Hill may have reviewed progress notes from Children and Family Services, Gargano has not shown that it was error for the ALJ to discount the opinion of a non-treating psychologist based on that opinion being qualified and/or based on subjective reports.

Gargano also argues that the ALJ discussed the opinions of Nurses Sweeney and Kauffman and Drs. Hunt and Hill in isolation without taking into account that the opinions were in agreement that Gargano's ability to perform full-time work due to his mental impairments was much more limited than the RFC. The ALJ discussed the details of all the opinions and weighed the opinion evidence. Tr. 396-397. Further, assuming arguendo that all the limitations contained in those opinions were more restrictive that the limitations included in the ALJ's RFC, the ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). In formulating the RFC, the ALJ weighed in the opinion evidence in light of the entirety of the record. While Gargano

disagrees with the ALJ's decision and weighing of the evidence, he has not shown a basis upon which this matter should be reversed and remanded for further consideration or evaluation of the evidence.

Considering the foregoing, the Court finds that reversal and remand is not warranted for further analysis of the opinions of Drs. Hunt and Hill and Nurses Sweeney and Kauffman.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: February 27, 2019

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge